IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

GAVYN A. GOW,             )    CIVIL ACTION NO. 9:15-1781-TMC-BM
                                )
                                )
            Plaintiff,      )
                                )
v.                         )    **REPORT AND RECOMMENDATION**
                                )
CAROLYN W. COLVIN,      )
Acting Commissioner of Social Security,   )
                                )
            Defendant.     )
_____)

        The Plaintiff filed the complaint in this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner wherein he was denied disability benefits. This case was referred to the undersigned for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a)(D.S.C.).

        Plaintiff applied for Supplemental Security Income (SSI) on August 10, 2011 (protective filing date), alleging disability beginning March 24, 2011, due to a broken right leg. (R.pp. 18, 126, 166). Plaintiff's claim was denied both initially and upon reconsideration. Plaintiff then requested a hearing before an Administrative Law Judge (ALJ), which was held on April 30, 2013 (R.pp. 59-87). The ALJ thereafter denied Plaintiff's claim in a decision issued November 1, 2013. (R.pp. 18-37). The Appeals Council denied Plaintiff's request for a review of the ALJ's decision, thereby making the determination of the ALJ the final decision of the Commissioner. (R.pp. 1-5).



Plaintiff then filed this action in United States District Court. Plaintiff asserts that there is not substantial evidence to support the ALJ's decision, and that the decision should be reversed and remanded for further consideration. The Commissioner contends that the decision to deny benefits is supported by substantial evidence, and that Plaintiff was properly found not to be disabled.

## Scope of review

Under 42 U.S.C. § 405(g), the Court's scope of review is limited to (1) whether the Commissioner's decision is supported by substantial evidence, and (2) whether the ultimate conclusions reached by the Commissioner are legally correct under controlling law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); Richardson v. Califano, 574 F.2d 802, 803 (4th Cir. 1978); Myers v. Califano, 611 F.2d 980, 982-983 (4th Cir. 1980). If the record contains substantial evidence to support the Commissioner's decision, it is the court's duty to affirm the decision. Substantial evidence has been defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. **If there is evidence to justify refusal to direct a verdict were the case before a jury, then there is "substantial evidence."** [emphasis added].

Hays, 907 F.2d at 1456 (citing Laws v. Celebrezze, 368 F.2d 640 (4th Cir. 1966)); see also, Hepp v. Astrue, 511 F.3d 798, 806 (8th Cir. 2008)[Noting that the substantial evidence standard is even "less demanding than the preponderance of the evidence standard"].

The Court lacks the authority to substitute its own judgment for that of the Commissioner. Laws, 368 F.2d at 642. "[T]he language of [405(g)] precludes a de novo judicial proceeding and requires that the court uphold the [Commissioner's] decision even should the court



disagree with such decision as long as it is supported by 'substantial evidence.'" Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

### Medical Records

The record reflects that Plaintiff was hospitalized from March 24 (his alleged disability onset date) to 28, 2011 for a closed, comminuted, displaced supracondylar/intercondylar/spiral fracture of his right distal femur. After undergoing surgery (performed by orthopedic surgeon Dr. Walter Grady), Plaintiff was instructed to be absolutely non-weight bearing for approximately ten weeks. (R.pp. 210-232). Plaintiff had a follow-up appointment with Dr. Grady a little over a week later, on April 7, 2011, where Dr. Grady noted that Plaintiff's wound was clean and appeared to be healing well, and that x-rays showed good overall position and alignment. Dr. Grady diagnosed Plaintiff with status post ORIF (open reduction internal fixation) of an extremely complex fracture, distal femur right lower extremity and status post fasciotomy, right upper leg, and compartment syndrome. He advised Plaintiff to use a continuous passive motion machine, a locked hinge range of motion knee brace, and to remain non-weight bearing for at least ten more weeks. (R.pp. 249-251).

Dr. Grady reevaluated Plaintiff on April 21, 2011, at which time he suggested Plaintiff use a bone growth stimulator and a brace. A little more fragmentation and an element of rotation of his leg were noted, but x-rays showed excellent overall position and alignment. Even so, Dr. Grady opined, based on current radiographs, that the time for Plaintiff to begin weight-bearing was going to be a lot longer than the originally estimated ten weeks. (R.pp. 252-253).

On May 3, 2011, a medical equipment representative was present at Dr. Grady's office for placement of a bone growth stimulator. Dr. Grady cautioned Plaintiff against opening his brace

3



and indicated he would try to get Plaintiff into physical therapy. (R.pp. 254-255). On May 10, 2012, Plaintiff reported that he had fallen the prior week, and had right lower extremity pain with a bruise on his right foot and ankle area. Dr. Grady noted that Plaintiff had zero to 126 degrees of clinical range of motion of his right lower extremity. He adjusted Plaintiff's leg brace, continued the use of the bone stimulator, and instructed Plaintiff to be non-weight bearing for an additional four weeks. (R.pp. 256-257). Plaintiff thereafter attended physical therapy from May 18 to June 16, 2011, stopping at that time due to his non-weight-bearing status and the fact that he was a self-pay. (R.pp. 233-237).

On May 31, 2011, Plaintiff reported that he had been using the bone stimulator for 27 days. He had pain situated over the proximal medial incision region with some occasional pain in the proximal gastroc region, but the swelling in the anterior lateral aspect of his right knee had gone down significantly. Dr. Grady reviewed x-rays and indicated that Plaintiff's bone stimulator use was working. He directed Plaintiff to continue using the stimulator, and instructed him to remain non-weight-bearing for another four weeks. (R.pp. 258-260). Plaintiff thereafter participated in vocational rehabilitation (including some physical therapy) from that day, May 31, 2011, continuing until March 28, 2012. (R.pp. 195-205).

On June 28, 2011, x-rays showed greater definitive healing, Plaintiff's range of motion was zero to 90 with effort, extension strength was 3 out of 5, flexion strength was 4 to 4+ out of 5, he had tenderness along the medial aspect of his knee primarily, and his knee was warm to touch without signs of infection. Dr. Grady ordered a CT scan and indicated that if the results were positive, Plaintiff would be advanced to "partial" weight bearing of 25%. (R.pp. 261-262). However, on July 11, 2011, Dr. Grady noted that Plaintiff had not obtained a CT scan because he had been



unable to afford one. Plaintiff's right lower extremity range of motion at that time was from zero to 90 within the confines of his brace, and he had tenderness in the lateral joint line region, likely due to scar tissue. Dr. Grady continued Plaintiff's use of a bone stimulator, and stated that he wanted Plaintiff to be about 65% healed before attempting significant weight bearing. (R.pp. 263-264).

Plaintiff did eventually obtain a CT scan of his right knee on July 20, 2011, which showed status post intraoperative fixation of a slightly displaced comminute fracture of his distal femur via metallic fixating hardware in satisfactory alignment and position, no endosteal or periosteal callus formation which was consistent with 0% healing, tri-compartmental osteoarthritis with advanced changes in the medial tibiofemoral joint compartment, and a very small retropatellar joint effusion. (R.p. 265). On August 1, 2011, Plaintiff reported that the feeling in the back of his knee had come back, but complained of pain and popping. Dr. Grady indicated that this and fluid collection in the lateral aspect of the knee were not unusual with the degree of injury Plaintiff had suffered. He agreed to Plaintiff's therapists working more aggressively, ordered a repeat CT scan in six weeks, and continued Plaintiff's use of the bone stimulator. (R.pp. 267-286). X-rays on August 29, 2011 indicated greater consolidation of Plaintiff's fracture site with definitive healing. Dr. Grady allowed Plaintiff to progress to 50% weight-bearing, and indicated that the plan was to get plaintiff a brace to stabilize his knee, which tended to flare into valgus. (R.pp. 269-270).

On September 8, 2011, Plaintiff's physical therapists indicated that Plaintiff had made gains in the prior four-week period, that Plaintiff should wean from crutch use, and thought Plaintiff required a different leg brace. (R.p. 202). Plaintiff thereafter complained about swelling on September 28, 2011, but Dr. Grady did note that Plaintiff had made nice gains with physical therapy, had a new brace, and that x-rays showed excellent overall position. (R.p. 247-248). On September



30, 2011, Plaintiff's physical therapists noted that Plaintiff had made remarkable gains over the previous three weeks and had improved his functional ambulation. (R.p. 201).

On October 14, 2011, Dr. Ted Roper, a state agency physician, reviewed Plaintiff's medical records and opined that Plaintiff had the physical RFC to perform medium work.[1] (R.pp. 92-93).

On October 18, 2011, Dr. Grady wrote a treatment summary in which he indicated that he first saw Plaintiff in March 2011,[2] after Plaintiff's femur head had been shattered in a motor vehicle accident. Dr. Grady opined that Plaintiff had a fair to guarded prognosis for recovery, noting that Plaintiff's last bone scan in July 2011 had showed zero percent healing. Although Dr. Grady had not prohibited Plaintiff from all weight bearing since "some weight bearing promotes bone healing," he was on a bone growth stimulator at that time. Plaintiff also continued to have to walk with the aid of two crutches at his last visit, which Dr. Grady indicated was appropriate for Plaintiff's condition. Dr. Grady stated that he could not "say at this time when [Plaintiff's] femur will heal or when he will be able to ambulate without two crutches." He also indicated that Plaintiff needed another bone scan to track the healing process, but that Plaintiff could not afford one. (R.p. 246).

On October 27, 2011, Dr. Grady wrote that Plaintiff was getting good grades from physical therapy, was starting to bend his knee, continued to have reduced range of motion, continued to have some swelling which was decreasing, and had intact strength. Dr. Grady continued Plaintiff

---

[1]Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. §§ 404.1567(c), 416.967(c).

[2]Although Dr. Grady wrote in this summary that Plaintiff was first seen in the emergency room in March 2010, he later submitted a statement (dated April 19, 2013), in which he stated that he actually first saw Plaintiff in March 2011. (R.p. 275). This is supported by surgical records indicating that surgery was performed by Dr. Grady in March 2011. (See, e.g., R.pp. 210-212).



on physical therapy and 75% weight-bearing. (R.pp. 243-245). X-rays on December 1, 2011 showed evidence of healing, and Dr. Grady recommended a six-month follow-up. (R.pp. 241-242). On January 10, 2012, Plaintiff's physical therapist noted that, up until recently, Plaintiff had essentially had a "nonfunctional right leg", but indicated improvement in Plaintiff's symptoms, noted that Plaintiff was walking at that time with just one crutch and a knee brace, and recommended a shoe lift and lateral wedge for his right foot to correct a discrepancy in leg length. (R.p. 194).

On January 13, 2012, State agency psychologist Dr. Larry Clanton reviewed Plaintiff's records and opined that Plaintiff's mental impairments were not severe. (R.pp. 101-102). That same date state agency physician Dr. Hugh Clarke completed a physical RFC assessment opining that Plaintiff was capable of performing medium work, to include an ability to stand and/or walk (with normal breaks) for a total of about six hours in an eight hour work day. When completing the section of the evaluation that asked how this opinion reconciled with source opinions, Dr. Clanton wrote "there is no indication that there is opinion evidence from any source". (R.pp. 102-103).

On February 15, 2012, Plaintiff complained to Dr. Grady about a catching sensation in the lateral aspect of his right lower extremity. Plaintiff was using a crutch to ambulate, was wearing a brace, and used a bone growth stimulator until he had to return it (it was on loan). Plaintiff complained of a 10/10 level of pain when walking. Plaintiff's weight was 294 pounds, with a BMI of 42.34. Dr. Grady noted that Plaintiff had crepitation over the lateral aspect of his distal femur which Dr. Grady thought was likely a combination of scar tissue and perhaps fascia. X-rays showed continued delayed union of Plaintiff's fracture with a little greater degree of lucency, and Plaintiff had reduced range of motion. Dr. Grady advised Plaintiff to use the bone growth stimulator again and indicated they would try to get Plaintiff a consultation with a traumatologist. Meloxicam (a non-



steroidal anti-inflammatory medication) was stopped, and Plaintiff was started on Vitamin D3, calcium, and magnesium. Plaintiff was instructed to continue using his brace and crutch and to avoid quick turns or torsional activities. (R.pp. 238-240).

Plaintiff was evaluated on March 12, 2012 by Dr. Scott Broderick, an orthopedic surgeon, at Dr. Grady's request. Plaintiff complained of continued pain with range of motion. Dr. Broderick noted that Plaintiff was approximately one year out from a right distal femur fracture, and that there was x-ray evidence that Plaintiff's screws were backing out and no longer properly aligned. New x-rays indicated that Plaintiff was in varus (abnormal inward turning of the bone). Plaintiff's weight was 291.6 with a BMI of 41.84. Dr. Broderick diagnosed nonunion of fracture, and recommended surgery including removal of hardware and bone grafting. (R.pp. 273-274). However, on April 9, 2012, Plaintiff reported being nervous about the process, with concern about not being able to help with activities due to incapacitation. Dr. Broderick noted that Plaintiff was using a crutch and had a basically unchanged gait. Range of motion was zero to 100. Dr. Broderick continued Plaintiff's medications, which included testosterone, meloxicam, vitamin D, and glucosamine. Surgery was scheduled for the following week. (R.pp. 271-272).

On August 30, 2012, Plaintiff reported that he had the same amount of pain, he was trying to maneuver on one crutch, his leg bothered him at rest and more when he was trying to ambulate, and he had continued swelling. Dr. Broderick indicated that, compared to prior films, x-rays showed better alignment and more callus formation. Even so, now over one year after Plaintiff's accident, fracture was still evident. It was difficult to get Plaintiff on the exam table, he was very slow, and he was moved into a wheelchair to go to the x-ray room. Dr. Broderick prescribed oxycodone and ordered a CT scan. (R.pp. 293-294).



On October 11, 2012, Plaintiff reported that his pain was not satisfactorily controlled, he was having trouble putting weight on his right leg, he was dealing with care for his mother, was caring for a grandchild, and was now ready to discuss surgery. Dr. Broderick noted that Plaintiff was using a single crutch; X-rays indicated that Plaintiff had a combination of malalignment, both rotationally and angularly in that plane; and a CT scan showed a nonunion. Plaintiff's right knee showed significant crepitance, and his gait was extremely antalgic with a little bit of a gluteus medius lurch. Medications (including oxycodone) were continued, and a temporary handicap parking sign was continued. Surgery was recommended, but Plaintiff said he was not ready to proceed with surgery at that time. (R.pp. 291-292). Medications were continued again on February 21, 2013 for Plaintiff's continued right leg pain, and a consultation with Dr. Thomas M. Schaller, an orthopedic surgeon, was recommended by Dr. Broderick. (R.pp. 289-290).

On March 8, 2013, Plaintiff was seen by Dr. Schaller, where he reported intermittent and sharp right knee pain. X-rays showed a varus malunion or nonunion, and examination revealed that Plaintiff's right knee had crepitance and prominence of the plate laterally. Dr. Schaller noted that Plaintiff ambulated with a single crutch with discomfort. Dr. Schaller indicated that Plaintiff had likely nonunion, or at best, a minimal union of his distal femur fracture, and discussed surgical correction. (R.pp. 286-288). Plaintiff was seen by Dr. Schaller again for a preoperative appointment on March 19, 2013, at which time Plaintiff reported intermittent, sharp, throbbing pain in his right leg. Medications, including oxycodone and meloxicam, were continued. (R.pp. 284-285). Plaintiff was thereafter hospitalized between March 21 and 24, 2013 for right femur nonunion open reduction with internal fixation with autologous bone grafting. (R.pp. 276-280).

9



On April 4, 2013, Plaintiff reported that he was taking no pain medication, was "very satisfied thus far," and felt much better than he did preoperatively. Dr. Schaller indicated that Plaintiff's wound was healthy and knee range of motion was 20 to 75. He indicated Plaintiff's need for a temporary handicap parking sign; stopped Plaintiff's oxycodone; and continued glucosamine, vitamin D, meloxicam, and testosterone. (R.pp. 282-283).

Following Plaintiff's hearing before the ALJ on April 30, 2013, x-rays taken on May 9, 2013 showed evidence of progression towards healing, Plaintiff had nearly full range of motion, and he had no swelling at his incision site. Dr. Schaller indicated that Plaintiff's quad tone was a little diminished compared to his left side, and ordered physical therapy. Plaintiff was to return in six weeks, at which time Dr. Schaller hoped to "progress his weight bearing . . . .". (R.pp. 296-297). This was now two (2) years after Plaintiff's accident.

## Discussion

Plaintiff was forty-five years old on his alleged disability onset date, and forty-seven years old at the time of the ALJ's decision. He has a high school equivalent education (GED) and past relevant work experience as a framing constructor, caregiver, and prep worker. (R.pp. 35, 68, 126, 166, 167). In order to be considered "disabled" within the meaning of the Social Security Act, Plaintiff must show that he has an impairment or combination of impairments which prevent him from engaging in all substantial gainful activity for which he is qualified by his age, education, experience and functional capacity, and which has lasted or could reasonably be expected to last for a continuous period of not less than twelve (12) months.



After a review of the evidence and testimony in the case, the ALJ determined in his decision of November 1, 2013 that, although Plaintiff does suffer from the "severe" impairments[3] of obesity and a fracture of his right femur (R.p. 20), he nevertheless retained the residual functional capacity (RFC) to perform sedentary work[4] with limitations that he could only lift up to ten pounds occasionally and less than ten pounds frequently; sit for six hours out of an eight-hour workday; stand/walk for two hours out an eight-hour workday; never push/pull with his right lower extremity; never climb ropes, ladders, or scaffolds; occasionally climb ramps and stairs; occasionally stoop, kneel, crawl, and crouch; and would need to use one crutch in order to ambulate. (R.pp. 24-25). At step four, the ALJ found that Plaintiff's limitations rendered him unable to perform any of his past relevant work, but he obtained testimony from a vocational expert ("VE") and found at step five that Plaintiff could perform other jobs existing in significant numbers in the national economy with his limitations, and was therefore not disabled during the period at issue. (R.pp. 35-37).

On January 30, 2014, after the ALJ had issued his decision, Dr. Schaller completed a questionnaire in which he indicated that on the date he first evaluated Plaintiff, a solid union was not evident on radiographic imaging and that Plaintiff's fracture was not clinically solid. He opined that Plaintiff's fracture interfered very seriously with his ability to independently initiate, sustain, and complete activities due to pain, mal-alignment, a limp, and weakness. He thought it was advisable

---

[3]An impairment is "severe" if it significantly limits a claimant's physical or mental ability to do basic work activities. See 20 C.F.R. § 404.1521(a); Bowen v. Yuckert, 482 U.S. 137, 140–142 (1987).

[4]Sedentary work is defined as lifting no more than ten pounds at a time and occasionally lifting and carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a).



for Plaintiff at that time to use two hand-held devices in order to minimize pain and stability of gait,

and further opined that it was "not likely that Plaintiff would be able to sustain a reasonable walking

pace over a sufficient distance to be able to carry out activities of daily living."  He also opined that

Plaintiff had most probably been so limited since the date of his injury on March 24, 2011, and stated

that Plaintiff had only gotten to the point that he could safely use a single handheld device as of his

appointment on June 27, 2013 (well over two (2) years after his accident).  (R.pp. 299-300).

This additional evidence was submitted to the Appeals Council, which nevertheless

upheld the ALJ's decision.  (R.pp. 1-2).  Plaintiff asserts, however, that the Appeals Council erred

by failing to remand the case to the ALJ to consider this new evidence from his treating physician

(Dr. Schaller), which Plaintiff argues might have affected the ALJ's decision, and after careful review

and consideration of the evidence and arguments presented, the undersigned is constrained to agree

with the Plaintiff that the Appeals Council failed to properly consider and evaluate the new evidence

submitted to that body in compliance with the standards set forth in Meyer v. Astrue, 662 F.3d 700

(4th Cir. 2011), thereby requiring a reversal with remand in this case.

Pursuant to 20 C.F.R. §404.970

(b) If new and material evidence is submitted, the Appeals Council shall consider the
additional evidence . . . where it relates to the period on or before the date of the
administrative law judge hearing decision.  The Appeals Council shall evaluate the
entire record including the new and material evidence submitted if it relates to the
period on or before the date of the administrative law judge hearing decision.  It will
then review the case if it finds that the administrative law judge's action, findings, or
conclusion is contrary to the weight of the evidence currently of record.

20 C.F.R. § 404.970(b).  In order to be "new" evidence, the evidence must not be "duplicative or

cumulative"; and in order to be "material," there must be a "reasonable possibility that it would have

changed the outcome."  Wilkins v. Secretary of Health & Human Servs., 953 F.2d 93, 96 (4th Cir.



1991). Here, this evidence was "new" because it was not considered by the ALJ in reaching his decision and contained functional findings from Plaintiff's treating physician that were not previously before the ALJ, and was "material" because it contains findings and conclusions from a treating source which are contrary to the ALJ's findings.

However, although the Appeals Council considered this evidence, it found that it did "not provide a basis for changing the [ALJ's] decision," form language found in many Appeals Council decisions. (R.pp. 1-2). No further discussion or analysis was provided, nor was an explanation given for why this new evidence was rejected. Concededly, the Fourth Circuit held in Meyer that Appeals Councils are not required to articulate a rationale for denying a request for review, and are required to make findings of fact and explain its reasoning only where it grants a request for review and issues its own decision on the merits. Meyer, 662 F.3d at 706. Even so, the Meyer court also noted that it was "certainly mindful that 'an express analysis of the Appeals Council's determination would [be] helpful for purposes of judicial review,'" Meyer, 662 F.3d at 706 (citing Martinez v. Barnhart, 444 F.3d 1201, 1207-1208 (10th Cir. 2006)); and went on to hold that, where the treating physician in that case had submitted a letter to the Appeals Council detailing Plaintiff's injuries and recommending significant restrictions on Plaintiff's activity, it "simply [could not] determine whether substantial evidence support[ed] the ALJ's denial of benefits . . .," because the ALJ, in rendering his decision, had specifically emphasized that the record *before him* did not include any restrictions from the treating physician. Id. at 707. Therefore, the Meyer court reversed the judgment of the district court and remanded for rehearing by the Social Security Administration. Plaintiff argues that, consistent with Meyer, remand is appropriate here in order to have this new



evidence considered because it is evidence from Plaintiff's treating physician which was not available to the ALJ and which undermines the ALJ's findings. The undersigned agrees.

The Commissioner contends that Dr. Schaller's questionnaire does not warrant remand because this evidence was not "new", arguing that Plaintiff could have asked this physician to provide an opinion on his behalf and submit it to the ALJ prior to the ALJ's decision. The Commissioner further argues that remand is not warranted because this new evidence is not "material", as Plaintiff has not made a showing that the ALJ's decision "might reasonably have been different" had the new evidence been before him. In making these arguments, the Commissioner appears to be using the definitions of "new evidence" and "material" as they relate to sentence six remands. However, as this evidence was presented to the Appeals Council as part of Plaintiff's appeal of the ALJ's decision, this evidence is considered under sentence four of § 405(g), not sentence six.[5]

---

[5]A district court may review the Commissioner's denial of benefits pursuant to either sentence four or sentence six of 42 U.S.C. § 405(g). See Shalala v. Schaefer, 509 U.S. 292, 296 (1993)[stating sentence four and sentence six are the "exclusive" methods by which courts may remand social security appeals]. Under sentence four, review is limited to the pleadings and the administrative record. See 42 U.S.C. § 405(b); Wilkins v. Sec'y, Dep't of Health & Human Servs., 953 F.2d 93, 96 (4th Cir. 1991)(en banc)["'Reviewing courts are restricted to the administrative record in performing their limited functioning of determining whether the [Commissioner's] decision is supported by substantial evidence.'" ](quoting Huckabee v. Richardson, 468 F.2d 1380, 1381 (4th Cir. 1972). Conversely, a remand may be appropriate under sentence six of 42 U.S.C. § 405(g) where new information is presented to the Court that was *not* part of the administrative record, "upon a showing that [this] new evidence [ ] is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g); see also Schaefer, 509 U.S. at 297 n. 2 ["Sentence-six remands may be ordered in only two situations: where the [Commissioner] requests a remand before answering the complaint, or where new, material evidence is adduced that was for good cause not presented before the agency."](citations omitted); Melkonyan v. Sullivan, 501 U.S. 89, 98 (1991)[discussing the difference between a sentence four and a sentence six remand, and noting that in a sentence six remand the district court "remands because new evidence has come to light that was not available to the claimant at the time of the administrative proceeding and that evidence might have changed the outcome of the prior proceeding."]. The additional evidence here is part of the record from when the action was before the Commissioner, as it was presented to and
(continued...)



Under a sentence four analysis, the letter from Dr. Schaller is new because it contains findings that were not before the ALJ at the time of the ALJ's decision and is therefore not duplicative or cumulative of the evidence before the ALJ. See Wilkins, 953 F.2d at 96 (4th Cir. 1991). The last of Dr. Schaller's treatment notes that were part of the record before the ALJ are from May 2013, approximately six weeks after Plaintiff's second surgery in March 2013. (See R.pp. 296-297). The questionnaire is from January 2014, and includes information from an appointment in June 2013. (R.pp. 299-300). The questionnaire not only provides a more detailed opinion from Dr. Schaller concerning Plaintiff's ability to ambulate, but it expresses an opinion that directly contradicts the ALJ's findings in his decision. It also appears that the additional evidence is new as the Appeals Council accepted it, made it part of the record, and considered it, stating that it did not provide a basis for changing the ALJ's decision (see R.p. 3), rather than returning it to Plaintiff. See 20 C.F.R. § 404.976(b)(1)["The Appeals Council will consider all the evidence in the [ALJ's] hearing record as well as any new and material evidence submitted to it which relates to the period on or before the date of the [ALJ's] hearing decision. If you submit evidence which does not relate to the period on or before the date of the [ALJ's] hearing decision, the Appeals Council will return the additional evidence to you with an explanation as to why it did not accept the additional evidence and will advise you of your right to file a new application."]; 20 C.F.R. § 404.970(b). Further, when a claimant seeks to present new evidence to the Appeals Council, he is not required to show good cause for failing to present the evidence earlier. Wilkins, 953 F.2d at 96 n. 3; cf. 20 C.F.R. § 404.970(b).

---

[5](...continued)
made a part of the record by the Appeals Council. Therefore, it is considered under sentence four, not sentence six.



With respect to whether this new evidence is "material" such that there is a reasonable possibility that this opinion[6] would have changed the outcome of the ALJ's decision, the Commissioner argues that is should not be considered "material" because it was not accompanied by any new objective clinical findings or treatment notes, and the ALJ already had Dr. Schaller's progress notes and post hearing notes and considered them in his analysis. However, as support for his decision the ALJ found that Dr. Schaller did not reference Plaintiff having a need for two crutches or a wheelchair, or articulate any postural or daily activities that Plaintiff should avoid or limit. (R.p. 31). The ALJ also wrote that "[t]he orthopedists have not indicated that the claimant could not walk a block at a reasonable pace on rough or uneven surfaces, or that he has the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, or the inability to climb a few steps at a reasonable pace with the use of a single hand rail." (R.p. 24). However, in the material submitted to the Appeals Council, Dr. Schaller specifically opined that Plaintiff's fracture interfered "very seriously with [Plaintiff's] ability to independently initiate, sustain, or complete activities," and had most probably been so limiting from the date of his injury (March 2011). (R.pp. 299-300). Dr. Schaller further opined that Plaintiff's condition had required the use of two hand-held devices for ambulation, and that it was not until June 27, 2013 (following Plaintiff's surgery), that he had progressed to the point that he could safely use one hand-held device. Id. If accepted, this opinion provides information that could support a finding that

---

[6]The Commissioner refers to Dr. Schaller's "June 30, 2014" opinion. However, although the opinion was submitted to the Appeals Council on that date, it was signed by Dr. Schaller on January 30, 2014. (See R.pp. 298, 300).



Plaintiff met or equaled Listing 1.06.[7] As such, there is a "reasonable possibility that it would have changed the outcome" of the decision because these findings are directly contrary to the ALJ's findings. (R.p. 31).

In sum, Dr. Schaller's opinion provides information as to whether Plaintiff could effectively ambulate prior to the second surgery and relating to his improvement thereafter. While the Commissioner argues the Appeals Council was justified in rejecting this new evidence because the ALJ already had Dr. Schaller's records and opinion before him when he made his decision, those records did not specifically address the findings made by Dr. Schaller in his opinion of January 2014, findings contrary to the findings of the ALJ. Hence, as was the case in Meyer, the undersigned simply cannot determine "whether substantial evidence supports the ALJ's denial of benefits," because the ALJ, in rendering his decision, did not have the benefit of Dr. Schaller's opinion specifically addressing many of the areas on which the ALJ's findings were based. As a treating physician, Dr. Schaller's opinion, particularly as a specialist in this area, would ordinarily be entitled to great weight; see Craig v. Chater, 76 F.3d 585, 589-590 (4th Cir. 1996)[Noting importance of treating physician opinion]; 20 C.F.R. § 404.1527(d)(5) (2001) [opinion of a specialist about medical issues related to his or her area of specialty are entitled to more weight than the opinion of a physician who is not a specialist]; and as stated by the Meyer Court in reversing and remanding the judgment of the District Court:

---

[7]In the Listings of Impairments, "[e]ach impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results." Sullivan v. Zebley, 493 U.S. 521, 530 (1990). Listing 1.06 relates to fractures and the ability to ambulate. A claimant is presumed to be disabled if his or her impairment meets or is medically equivalent to the criteria of an impairment set forth in the Listings. See 20 C.F.R. § 416.925.



> Thus, no fact finder has made any findings as to the . . . physician's opinion or attempted to reconcile that evidence with the conflicting and supporting evidence in the record. Assessing the probative value of competing evidence is quintessentially the role of the fact finder. We cannot undertake it in the first instance. Therefore, we must remand the case for further fact finding.

Meyer, 6662 F.3d at 707.

Such is the case here.

Therefore, under the facts of this particular case, remand is required in order to have a finding made as to the weight to be given to this new evidence and, if appropriate, the reason for the Commissioner's rejection of a treating physician's opinion. Cf. Cotter v. Harris, 642 F.2d 700 (3rd Cir. 1981) [listing cases remanded because of failure to provide explanation or reason for rejecting or not addressing relevant probative evidence]; Wheelock v. Astrue, No. 07-3786, 2009 WL 250031, at * 8 (D.S.C. Feb. 3, 2009)[Remanding case to obtain assessment of new and material evidence presented by Plaintiff to the Appeals Council where Appeals Council did not specify a reason for rejecting it or explicitly indicating the weight given to that evidence]. While it is certainly possible that the ALJ on remand might still reach the same conclusions as are set forth in the original decision, or perhaps determine that Plaintiff can perform other types of work, that is a finding that must be made by the ALJ, not by this Court in the first instance. See Pinto v. Massanari, 249 F.3d 840, 847 (9th Cir. 2001)[Court cannot affirm a decision on a ground that the ALJ did not himself invoke in making the decision]; Bray v. Commissioner of Social Security Admin., 554 F.3d 1219, 1225 (9th Cir. 2009)["Long-standing principles of administrative law require us to review the ALJ's decision based on the reasoning and factual findings offered by the ALJ - not *post hoc* rationalizations that attempt to intuit what the adjudicator may have been thinking."]; Nester v. Astrue, No. 08-2045, 2009 WL 349701 at * 2 (E.D. Feb. 12, 2009)[Noting that the Court "may not consider *post hoc*



rationalizations but must evaluate only the reasons and conclusions offered by the ALJ."].   Remand will further allow the ALJ to reconsider and re-evaluate the evidence in toto as part of the reconsideration of this claim. Hancock v. Barnhart, 206 F.Supp.2d 757, 763-764 (W.D.Va. 2002)[On remand, the ALJ's prior decision has no preclusive effect, as it is vacated and the new hearing is conducted *de novo*].

## Conclusion

Based on the foregoing, and pursuant to the power of this Court to enter a judgment affirming, modifying or reversing the decision of the Commissioner with remand in Social Security actions under Sentence Four of 42 U.S.C. § 405(g), it is recommended that the decision of the Commissioner be **reversed**, and that this case be **remanded** to the Commissioner for the administrative action as set forth hereinabove, and for such further administrative action as may be necessary.  See Shalala v. Schaefer, 509 U.S. 292 (1993).

The parties are referred to the notice page attached hereto.

_____
Bristow Marchant
United States Magistrate Judge

March 29, 2016
Charleston, South Carolina

19



**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

